Filed 8/26/20  In re Anna Z. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re ANNA Z. et al., Persons Coming Under the Juvenile Court Law. | |
| | D077267 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| | (Super. Ct. No. EJ4202A/B) |
| Plaintiff and Respondent, | |
| v. | |
| DEBRA Z., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Marian F. Gaston, Judge.  Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Emily Harlan, Deputy County Counsel, for Plaintiff and Respondent.

Debra Z. appeals from orders terminating her parental rights and selecting permanent plans of adoption for her children, Anna Z. and Mason Z. (the children).  The sole issue on appeal is whether the juvenile court erred in not applying the sibling relationship exception to termination of parental rights (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(v)).[1]  Under this exception, a court may find that terminating parental rights would be detrimental to a child because there would be substantial interference with the child's sibling relationship, taking into consideration various factors.  The court weighs the benefits of obtaining permanence through adoption with the benefits of maintaining a significant sibling relationship in a lesser permanent plan.

We conclude the court did not err in declining to apply the sibling relationship exception, and accordingly affirm the orders terminating parental rights.

FACTUAL AND PROCEDURAL BACKGROUND

The siblings in this appeal, Anna and Mason, are currently 15 and eight years old, respectively, and this is their second dependency case.  They are not biological siblings; rather, they became siblings by adoption.

In 2004, when she was a baby, Anna was removed from her birth parents and placed with Debra Z. (Mother).  Anna was adopted by Mother in 2006 (there is no adoptive father).  In May 2012, when Anna was nearly eight years old, Mason was born, removed from his birth parents, and placed with Mother, who adopted him in October 2015.  The children had another sibling by adoption, Olivia Z., who is now an adult.

---

[1]  Further statutory references are to the Welfare and Institutions Code.

Leading up to September 2017, Anna was reportedly suffering from digestion issues, weight loss, and pain, among other symptoms. She relied on intravenous feeding and increasing doses of opioid pain medication. In September, Anna was admitted to a hospital's intensive care unit for shock and a severe vitamin deficiency caused by many months of not receiving her vitamins and nutrition intravenously at home. While under the hospital's care (and away from Mother's influence), Anna's condition markedly improved; she gained weight, weaned off pain medication, and began eating normally. This was not the first time that Anna's health had mysteriously deteriorated at home but quickly improved when hospitalized.

Anna's treatment team was extremely concerned about her welfare under Mother's care and supervision. The healthcare providers suspected Mother of negligence at best, and of fabricating or misreporting her daughter's symptoms at worst. Despite extensive testing, Anna had no confirmed medical diagnosis to explain the severity of her reported pain, or to require continuous use of intravenous feeding. Mother adamantly denied she had done anything wrong and blamed healthcare providers for failing to properly diagnose and/or treat her daughter.

In October 2017, the San Diego County Health and Human Services Agency (Agency) filed a petition on behalf of 13-year-old Anna, alleging she was at substantial risk of serious physical harm due to Mother's conduct (§ 300, subd. (b)). The juvenile court detained Anna out of home. In December 2017, the court issued a temporary no contact order, based on Mother's inappropriate, unsupervised communications with Anna. In January 2018, the court made a true finding on the petition, removed Anna from Mother's care, ordered reunification services, and allowed for supervised

visitation.[2]  By then, Anna had already gone from being a sickly, malnourished invalid to a largely healthy, lively teenage girl.

Mother underwent a psychological evaluation, in which she displayed symptoms consistent with factitious disorder imposed on another (FDIA).[3] Regarding this diagnosis, the evaluator noted that Mother "significantly identifies herself as the mother of a medically fragile child.  There are records documenting years of numerous hospitalizations, invasive medical procedures, and chronic administration of high doses of narcotic pain medications for minor Anna . . . with many treatments based on parental reports of symptoms. . . ."  The assigned social worker believed that Mother had deprived her daughter of a normal childhood and that Anna primarily identified herself as a "sick kid."  Anna "appear[ed] to only know how to relate to others on a level of healthy and sick."

In February 2018, the suspicious hospitalization of another child in Mother's guardianship (N.K.) caused the Agency to become concerned that Anna's adoptive sibling, five-year-old Mason, would be Mother's next target. The Agency filed a petition on his behalf (§ 300, subd. (j)).  The court issued a protective custody warrant for Mason and detained him out of home.  He was placed in foster care.

---

[2]    Mother waived her right to contest the petition and submitted the matter to the court based on the Agency's reports.

[3]    The diagnosis of FDIA was later confirmed by a second psychological evaluation.  The second evaluator described FDIA, also known as Munchausen syndrome by proxy, as a "dangerous kind of maltreatment in which [a] caretaker[], usually [a] parent[], deliberately and repeatedly exaggerates, fabricates, [and/or] induces a [health] problem or problems in someone that is under [his or her] care."

In early April 2018, Anna was discharged from the hospital and placed in the same foster home as Mason. While there, Anna thrived and was able to successfully complete an outpatient eating disorder clinic. Mason, however, began experiencing behavioral problems at school and at home in the form of defiance and aggression. He was subsequently diagnosed with an adjustment disorder and attention deficit hyperactivity disorder (ADHD) and prescribed several medications to help with his symptoms. By June, the Agency moved Mason to a different placement. Anna chose to stay in her current foster home and visit with Mason.

Mother was arrested and charged criminally with child endangerment. She bailed out of jail, and a criminal protective order allowed her to have only supervised contact with the children.

In August 2018, the court made a true finding on Mason's petition, removed him from Mother's care, and ordered reunification services.

Throughout 2018 and into early 2019, Mother was unable to make adequate progress on her case plan or gain insight into the protective risks. She visited with the children in supervised settings. The children also enjoyed weekly visits with each other, arranged by their caregivers. Anna was doing very well, yet Mason was continuing to struggle daily with aggressive behaviors. He moved through several placements. He was destabilized by visits with Mother and frequently asked if he could stop visiting her.

Anna's court appointed special advocate (CASA), who spent time with her on a weekly basis, reported that Anna was benefitting, and would continue to benefit, from being in a separate placement than Mason. Due to his significant behavioral problems and Anna's relatively passive nature, Mason would divert caregivers' time and attention to himself. In addition,

5

Anna's therapist did not believe Anna held a strong attachment to Mason but cared about him for nostalgic reasons. Anna was emotionally closer to her other adoptive sibling, Olivia, who was only two years older than Anna.

In February 2019, the children's counsel filed a section 388 petition to terminate Mother's services before Mason's 12-month review hearing. The following month, the court terminated her services and set a section 366.26 hearing. The court also discontinued visits between Mason and Mother due to their negative effect on him.

The date for the section 366.26 hearing was rescheduled to allow the Agency time to assess the children's permanent plans. Anna continued her visits with Mother and, separately, with Mason and occasionally Olivia. Sibling visits between Anna and Mason were positive; they would physically play together (swinging and/or running around). Anna and Olivia "interacted with each other like typical sisters . . . giggling and laughing . . . [and] taking goofy pictures of each other."

In May 2019, Mason was placed in a home with foster parents who were committed to adopting him. He would be the only child in the home and have his parents' full attention. When asked how he felt about being adopted by his current foster parents, he responded by pointing to a "super happy face" emoji. The Agency assessed him as generally and specifically adoptable and recommended adoption as his permanent plan.

Anna was separately placed in the same foster home as Olivia, who was by then an adult. Several other children also lived in the home. The caregivers had known Anna since she was five years old, loved her, and wished to adopt her. In turn, Anna wanted to be adopted by them. Although she was fond of Mason and wished to continue visiting him, Anna understood that they could not be placed together due to his special needs. The Agency

assessed Anna as specifically adoptable by her current caregivers and recommended adoption as her permanent plan.

Both Mason's and Anna's caregivers believed in continuing sibling contact. The caregivers facilitated two visits a month.

The contested section 366.26 hearing was held in February 2020. The court received in evidence Agency and CASA reports without objection, and heard live testimony from the Agency's social worker, Anna, and Mother. Since November 2019, Anna had declined all visits with Mother. Anna articulated her understanding of what adoption meant and her desire to be adopted by her current caregivers. Mother admitted she no longer had any bond with Mason but claimed to still have a bond with Anna.

After hearing the evidence and considering the arguments of counsel, the juvenile court found the children adoptable, terminated Mother's parental rights, and ordered permanent plans of adoption. The court specifically considered and rejected applicability of the sibling relationship exception, discussing how the caregivers were committed to maintaining the sibling relationship and that, in any event, the benefits of adoption outweighed the benefits of their sibling relationship.

Mother's appeal followed.

DISCUSSION

A. *Legal Principles Regarding Sibling Relationship Exception*

If a juvenile court finds that a child is likely to be adopted, adoption must be ordered unless there is a "compelling reason" to apply one of the statutorily enumerated exceptions. (§ 366.26, subd. (c)(1)(B).) One of the specified exceptions is the sibling relationship exception, which applies where, "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the

7

relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).)

Employing a two-step process, the juvenile court first determines whether terminating parental rights would substantially interfere with the sibling relationship. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 952 (*L.Y.L.*).) If this first requirement is met, "the court is then directed to weigh the child's best interest in continuing that sibling relationship against the benefit the child would receive by the permanency of adoption." (*Ibid.*; § 366.26, subd. (c)(1)(B)(v).) "[E]ven if adoption would interfere with a strong sibling relationship, the court must nevertheless weigh the benefit to the child of continuing the sibling relationship against the benefit the child would receive by gaining a permanent home through adoption." (*In re Celine R.* (2003) 31 Cal.4th 45, 61.)

The parent opposing adoption has the burden of proving the statutory exception for sibling relationships applies. (*In re Daniel H.* (2002) 99 Cal.App.4th 804, 813 (*Daniel H.*).) This is considered "a heavy burden." (*Ibid.*) The authors of the legislation adding the sibling relationship exception envisioned that its applicability would " 'likely be rare,' " meaning "that the child's relationship with his or her siblings would rarely be

8

sufficiently strong to outweigh the benefits of adoption." (*L.Y.L.*, *supra*, 101 Cal.App.4th at p. 950.)[4]

We review the court's factual findings underlying the sibling relationship exception for substantial evidence and the court's weighing of competing interests for an abuse of discretion. (*In re Isaiah S.* (2016) 5 Cal.App.5th 428, 437 (*Isaiah S.*); *In re D.O.* (2016) 247 Cal.App.4th 166, 174 (*D.O.*).)[5]

B. *Analysis*

Mother's sole argument on appeal is that the juvenile court erred in not applying the sibling relationship exception to termination of parental rights. She contends that a lesser permanent plan, like long-term foster care or guardianship, should have been ordered so that Anna and Mason could continue their relationship. We reject Mother's arguments and conclude the juvenile court did not err in determining the sibling relationship exception does not apply here.

1. *Substantial Interference With Sibling Relationship*

"To show a substantial interference with a sibling relationship the parent must show the existence of a significant sibling relationship, the

---

[4] If the court finds that the sibling relationship exception applies, it must select legal guardianship or long-term foster care rather than adoption. (§ 366.26, subd. (c)(4)(A).)

[5] Mother contends only the substantial evidence standard of review applies. The question of what standard of appellate review applies to another statutory exception to adoption (the beneficial parental relationship exception) is currently pending before our Supreme Court. (*In re Caden C.* (2019) 34 Cal.App.5th 87, review granted July 24, 2019, S255839.) Even if we had solely applied the substantial evidence standard of review, we would still conclude the juvenile court did not err in declining to apply the sibling relationship exception in the circumstances of this case.

9

severance of which would be detrimental to the child. Many siblings have a relationship with each other, but would not suffer detriment if that relationship ended. If the relationship is not sufficiently significant to cause detriment on termination, there is no substantial interference with that relationship." (*L.Y.L.*, *supra*, 101 Cal.App.4th at p. 952.)

In this case, substantial evidence supports the trial court's conclusion that the sibling relationship exception does not apply. The record supports both (1) a finding that there would be no interference with the siblings' relationship, and (2) a finding that the children would not suffer any detriment even if their relationship was severed.

First, there is substantial evidence in the record to support a finding that terminating Mother's parental rights and ordering adoption as the children's permanent plan would not substantially interfere with their sibling relationship. The juvenile court found that, while not dispositive, "the current caregivers have demonstrated their commitment to maintaining the relationship between the children." This is an appropriate factor for the juvenile court to consider in analyzing the sibling relationship exception. (See, e.g., *D.O.*, *supra*, 247 Cal.App.4th at p. 175 [juvenile court may consider assurances of continued sibling visits in determining whether there will be substantial interference with a sibling relationship]; *In re Jacob S.* (2002) 104 Cal.App.4th 1011, 1019 [there was "no evidence that the relationships between any of the siblings will necessarily cease upon termination of parental rights," where prospective adoptive parents were willing to allow siblings to continue their relationship].) There was evidence from the social worker, the children's CASA, and Anna that the caregivers supported

ongoing contact between the siblings.[6] The juvenile court could properly credit this testimony, and reject Mother's conjecture that the caregivers might not facilitate visits in the future.[7]

Second, although there is some evidence of a bond between the children, there is substantial evidence in the record that their relationship was not sufficiently significant to cause detriment on termination. (See *L.Y.L.*, *supra*, 101 Cal.App.4th at p. 952.) Anna and Mason are not siblings by birth, there is an eight-year age difference between them, they did not share significant common interests, and they do not have a strong emotional connection.[8] The children lived together for about five years in Mother's care before the Agency's intervention, but their shared experiences were plagued by Mother's life-threatening medical abuse and neglect of Anna.[9] By the

---

[6] Mother argues the children's relationship "has already been harmed," pointing to a reduction in visits between the children during the dependency proceedings. But this does not aid her position. To the extent there were periods during the dependency case when the siblings had less contact, without experiencing any associated difficulties, this bolsters a finding that the sibling relationship exception does not apply. In addition, Mother fails to acknowledge her role in the reduced contacts. Some visits between Anna and Mason occurred concurrently with the children's visitation with Mother, but Mason's relationship with Mother deteriorated to the point where he refused visits, eventually leading the court to issue a no visitation order between Mason and Mother in March 2019. There was a five-week period where the children did not see each other because Mason was refusing to attend visits.

[7] Mother's counsel argued in closing that "[t]here is no guarantee that either Mason's caretakers or Anna's caretakers will keep that relationship going," but Mother presented no *evidence* to support this assertion and meet her burden of proving that the sibling relationship exception applies here.

[8] According to Anna's therapist, she did not have a strong attachment to Mason.

[9] Medical professionals opined that Mother's actions were life threatening to Anna. When she was hospitalized in 2017, she was in severe

11

time of the section 366.26 hearing, Anna and Mason had lived apart for well over two years and suffered no discernable distress from living apart. To the contrary, the record shows that each child individually benefited from being placed separately. Furthermore, the children wished to remain in their separate placements and be adopted by their current caregivers. Anna articulated an age-appropriate understanding of the meaning of adoption and wanted to be adopted, even if that meant terminating her sibling relationships. Mason similarly indicated his desire to be adopted. He had a good time visiting with Anna and Olivia but was largely indifferent to whether the visits continued. This evidence amply supports a finding that the children would not suffer detriment from severing their sibling relationship. (*L.Y.L.*, *supra*, at p. 952.)

Mother points to other evidence in the record to support her claim that the court erred, contending the children had a good relationship, they enjoyed their visits, and they cared about one another. On appeal, however, we review the record to determine whether substantial evidence supports the juvenile court's ruling, not Mother's position. We reject Mother's arguments based on this record.[10]

---

shock and near death. Anna's perilous condition was evident to her siblings. In October 2017, Olivia reported that Anna had spent the last few years of her life on the couch because she lacked the energy to walk upstairs. Anna screamed in pain "every day and every night," and Olivia and Mason would ask if she needed anything. Anna's life revolved around being a "sick kid," and her primary way of relating to other people was "on a level of healthy and sick."

[10] Mother has also failed to demonstrate how maintaining her parental rights would promote the sibling relationship. She was under court order *not* to visit Mason, and both children refused to visit her anymore. Mother has not shown how preserving her parental rights would enhance the sibling

12

2. *Benefits of Adoption Versus Maintaining Sibling Relationship*

We further conclude that the court did not abuse its discretion in finding that the benefits of adoption outweighed the benefits of the children's sibling relationship.

This was the second dependency case for each child. Despite their significant struggles, Anna and Mason were now separately thriving in their prospective adoptive homes. Anna's horrific ordeal has already been recounted *ante*. She was just beginning to process what her Mother had done, and to realize that she was a victim of her Mother's extreme medical neglect. In addition to gaining this new insight regarding her Mother, she was aware that she and her brother were differently situated and had different needs. Anna was 15 years old by the time of the section 366.26 hearing, and she clearly articulated her preferences. She wished to gain permanence through being adopted by her current caregivers, who she had known since the age of five, and she understood that Mason was better off living elsewhere. Her prospective parents provided Anna a home where she felt safe and supported. In addition, in this home, Anna would have greater contact with Olivia, to whom she held a stronger attachment. She was also doing well in school, where she was engaged in typical teenage activities and interactions with her peers.

For Mason's part, given his special needs and behavioral issues, it was in his best interest to be adopted into a home where he was the only child. Because Mason had seven prior placements, permanence and stability were particularly important for him. Mason's current caregivers, who were willing to adopt him, were aware of his needs and able to meet them and provide a

---

relationship or be in either child's best interest. (*Isaiah S.*, *supra*, 5 Cal.App.5th at pp. 438-439.)

stable home. He also had made significant progress in his new school, supported by his prospective parents with whom he had already formed an attachment. Although he enjoyed his visits with Anna, his long-term emotional and developmental interests were better served by the permanency of adoption rather than ongoing sibling contact.

Because Mother only argues for a substantial evidence standard of review, she does not specifically argue that the juvenile court abused its discretion in finding that the benefits of adoption outweighed the benefits of the children's sibling relationship. Nonetheless, Mother's arguments lack merit and do not show any abuse of discretion. Mother notes the purpose of the sibling relationship exception is to "preserve long-standing sibling relationships that, 'serve as anchors for dependent children whose lives are in turmoil.'" (Citing *In re Erik P.* (2002) 104 Cal.App.4th 395, 404.) Although the children enjoyed their visits, Mother has not demonstrated that they served as "anchors" for one another such that the benefits of maintaining their relationship outweighed the benefits of adoption. Similarly, Mother generally contends the children had "good relationships" (according to their respective court appointed special advocates); that their visits were positive (according to the visitation monitor); and that Anna wished to continue having a relationship with Mason (according to testimony by an Agency social worker). But Mother fails to establish that the court abused its discretion when it weighed these factors against the benefits of adoption. (See *In re Daisy D.* (2006) 144 Cal.App.4th 287, 293 ["[A]lthough the [child] clearly enjoyed the time she spent with her half siblings, there was no evidence that the detriment she might suffer if visits ceased presented a sufficiently compelling reason to forgo the stability and permanence of adoption by caretakers to whom she was closely bonded."].) Contrary to Mother's

14

assertion that the juvenile court should have considered guardianship or long-term foster care for the children, the court properly balanced "the beneficial interest of the child[ren] in maintaining the sibling relationship, which might leave the child[ren] in a tenuous guardianship or foster home placement, against the sense of security and belonging adoption and a new home would confer." (*L.Y.L.*, *supra*, 101 Cal.App.4th at p. 951.) Finally, Mother argues that the "gap in ages" between the children should not serve as an impediment to application of the sibling relationship exception. There is no evidence that the juvenile court viewed the age difference as an "impediment" to applying the sibling relationship exception, but the age difference was nonetheless relevant to show the children had limited common experiences.[11]

Even if we assume the juvenile court erred in not applying the sibling relationship exception as to Anna, each child must be considered separately. (See *Daniel H.*, *supra*, 99 Cal.App.4th at p. 813 [the court performs the best interest analysis from the perspective of the adoptive child, not other siblings].) Mother provided no evidence at all specific to Mason. When asked about Anna's sibling bond, Mother mentioned Olivia (who is now an adult), and notably did not mention Mason. Mother also acknowledged that she has

---

[11]    The case cited by Mother on this point (*In re Naomi P.* (2005) 132 Cal.App.4th 808) is inapposite. That case involved a different procedural posture; the appellate court was reviewing the juvenile court's finding that the sibling relationship exception applied where the court "had the opportunity to observe the demeanor of the relevant witnesses" and "had some doubts about [the] intentions [of Naomi's prospective adoptive mother], and of her appreciation of the importance of Naomi's sibling relationships." (*Id*. at p. 824.) In this case, we review the juvenile court's determination that the sibling relationship exception does not apply, and Mother has failed to meet her burden of demonstrating error or an abuse of discretion for the reasons already discussed.

no bond with Mason any longer.

To summarize, given the limited nature and strength of the sibling bond between Anna and Mason, the juvenile court had substantial evidence to support its finding that their relationship was not so significant that its loss would be detrimental, and the court did not abuse its discretion in determining that the benefits to Anna and Mason of adoption outweighed any bond they might have.  This was not one of those rare cases providing a "compelling reason" for application of the statutory exception.  (§ 366.26, subd. (c)(1)(B).)

## DISPOSITION

The orders terminating parental rights are affirmed.


GUERRERO, J.

WE CONCUR:


BENKE, Acting P. J.


O'ROURKE, J.

16